FILED

2009 Sep-17  PM 02:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SONIA THOMAS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:08-CV-00885-RDP** |
| | } | |
| **CITY OF BIRMINGHAM,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the Motion for Summary Judgment filed by Defendant on February 24, 2009, (Doc. # 15), and the Motion for Summary Judgment filed by Plaintiff on February 27, 2009, (Doc. # 17). The motions have been fully briefed and were under submission as of March 27, 2009. (*See* Docs. # 10, 13).

The parties' competing motions both seek summary judgment on Plaintiff's only remaining claims of discrimination and retaliation, both of which were brought pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12111 *et seq.* ("ADA").[1]  For the reasons outlined below, the court finds that Defendant's motion for summary judgment is due to be granted as to Plaintiff's discrimination claim and denied as to Plaintiff's retaliation claim.  Plaintiff's motion for summary judgment is due to be denied as to both counts.

---

[1] Although Plaintiff's complaint also alleged a state law claim for intentional infliction of emotional distress, she has conceded that claim is due to be dismissed on summary judgment. (Doc. # 25, at 29).

I.      **Legal Standards for Evaluating Summary Judgment**

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination.  Once the plaintiff proves a

---

[2] Thus, in the absence of direct or statistical evidence of discrimination, neither of which Plaintiff argues here, Plaintiff's claims are evaluated based on circumstantial evidence under the traditional burden-shifting framework. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th 2001); *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000).

*prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54;  *Desert Palace*, 539 U.S. at 101-02.

## II.    Relevant Undisputed Facts[3]

Plaintiff's employment with the City began in 1987, when she was hired as a stenographer, and ended in August 2007, when she was discharged from her position as Administrative Assistant II.  (Plaintiff Dep. p. 20).  At the time of her dismissal, Plaintiff's job duties mainly consisted of typing Birmingham City Council minutes, filing, typing for different boards and agencies, preparing agendas, and completing mass mailings. (Plaintiff Dep. pp. 23-24).  Plaintiff's job description listed the following essential duties: preparing, proofreading, and correcting City Council minutes; preparing and distributing meeting notices and agendas for various boards and agencies; filing, maintenance, and indexing of revenue bond issue projects, transcripts, meeting minutes and other documents; answering the telephone; assisting in employee training; assisting in voting and election returns; preparing and distributing City Council minutes; taking dictation; and receiving monthly information for the Emergency Medical Services Committee. (Smith Dep. DX5).   There is no indication from the record that Plaintiff received any formal discipline for attendance, performance,

---

[3] If facts are in dispute, they are stated in the manner most favorable to Plaintiff.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

or any other work-related issues in her Administrative Assistant II position. (Smith Dep. pp. 23-24; Plaintiff Dep. pp. 126-27; Frazier Dep. pp. 26-28).

At the time of her dismissal, Plaintiff was employed by the City Clerk's office, and her supervisors were City Clerk Paula Smith and Deputy Clerk Lee Frazier. (Plaintiff Dep. p. 24). Rule 13.21 of The Rules and Regulations of the Personnel Board of Jefferson County provides "[a]ny employee who believes that he or she needs a reasonable accommodation in order to perform the essential function of his or her position should notify the Appointing Authority of the need." (Smith Dep. PX2, at Rule 13.21).

### A.   Plaintiff's Medical Condition

Plaintiff suffers from DeQuervains Tenosyvitis, Cubital Tunnel Syndrome, and a Neuroma. (Sherrill Dep. pp. 24-25).[4] As a result of her conditions, Plaintiff's grip strength and pinch strength are diminished. (Sherrill Dep. p. 34).[5] Cubital Tunnel limits her ability to perform activities with her elbow extremely bent or put pressure on the inside of the elbow, while DeQuervains limits her ability to perform repetitive gripping or carrying. (Sherrill Dep. pp. 39-40). Thus, Plaintiff experiences "problems with my . . . ability to lift heavy objects with my hands . . . . [and] grasp small objects, like pens, toothbrushes, and pencils . . . ." (Plaintiff Aff., at ¶¶ 6-7).

Plaintiff testified that as a result of pain from her conditions, she is unable to drive long distances, type for long periods of time, grasp a pen in the normal fashion, or lift or carry items like

---

[4] Although the parties dispute whether Plaintiff's conditions were caused by her job, that is immaterial to the court's analysis in this opinion. Thus, the court has not considered evidence offered by Defendant that "Plaintiff admitted to [her personal physician] twice that her wrist ailment was not work related." (Doc. # 24, at 16 (citing Sherrill Dep. pp. 66-69)).

[5] Dr. Joseph Sherrill, who is Plaintiff's orthopaedic surgeon, admitted that he is not trained to pronounce whether or not Plaintiff is able to work in light of these conditions. (Sherrill Dep. 74).

groceries with her right hand. (Plaintiff Dep. pp. 137-38; Plaintiff Aff.,at ¶ 8). Moreover, Plaintiff

stated that "[c]ooking and cleaning around the house are extremely difficult because I have a very

hard time gripping items." (Plaintiff Aff., at ¶ 9). Plaintiff's three grandchildren live with her

because her daughter is "in and out," and in her daughter's absence, Plaintiff "ha[s] the three

children." (Plaintiff Dep. pp. 14-16,127, 140-42).[6]

On January 8, 2001, Plaintiff began seeing City doctors for wrist, arm, and hand pain. (Smith

Dep. PX13). On numerous occasions thereafter (including January 8, 2001; January 16, 2001;

January 23, 2001; April 4, 2001; December 21, 2001; April 2, 2002; April 13, 2004; and August 26,

2004), City doctors examined Plaintiff and submitted to her employer a corresponding "Certificate

for Work Related Illness/Evaluation" (hereinafter a "Certificate"), each of which prescribed limited

work duty with certain accommodations. (Smith Dep. PX13; PX12; PX14; PX16; PX18; PX19;

PX17; PX20 (respectively)). As Deputy Clerk of the City Clerk's office, Frazier kept Plaintiff's

personnel file and received copies of the Certificates that she submitted. (Frazier Dep. pp. 26, 32,

106-07). It is undisputed that, at some point during the course of her 2001-2004 treatment program,

---

[6] The court admonishes Defendant for *repeatedly* misrepresenting Plaintiff's testimony regarding her ability to perform daily life activities. Citing to Plaintiff's deposition, Defendant asserts in each of its summary judgment briefs that "Plaintiff can cook, shop, read, drive, walk, and care for herself, despite her impairment. ([Plaintiff Dep.] p. 136-138, 142)." (Doc. # 24, at ¶ 8; *see also* Doc. # 16, at 14; Doc. # 24, at 10-11; Doc. # 26, at 2). However, contrary to Defendant's representation, the cited evidence reveals that Plaintiff is *unable* to shop by herself: "I don't go to the grocery on my own because I can't – I can't carry anything, and lifting is a problem." (Plaintiff Dep. pp. 137-38). Moreover, neither the referenced pages of Plaintiff's deposition - nor any other portion of her deposition - discusses her ability to cook, read, or walk. Instead, Plaintiff's affidavit suggests that she has limited ability to cook, if at all. (Plaintiff Aff., ¶ 9). Finally, although Plaintiff's affidavit suggests that she is able to care for herself in some capacity, Defendant's briefs cite to Plaintiff's deposition, not her affidavit. (Plaintiff Aff., ¶ 10). Defendant is cautioned to *closely* examine both the testimony cited and the evidence in its entirety before making a representation to this court.

both Smith and Frazier became aware of Plaintiff's conditions, understood that she was seeking medical care therefore, observed her wearing arm braces, and/or were apprised of the duty limitations suggested by her doctors.  (Smith Dep. pp. 29-31, 46; Frazier Dep. pp. 105-10).

In March 2002, Plaintiff sought "accommodations"[7] from Defendant because of her wrist, arm, and hand conditions, and in return she received an ergonomic keyboard and the use of a utility cart for transporting heavy files. (Plaintiff Dep. pp. 130-32; Smith Dep. pp. 27-31).  The City also trained another employee to take minutes at the City Council meetings because of the "severity of the pain" for Plaintiff to fulfill this task.  (Plaintiff Dep. DX7; Smith Dep. pp. 27-28).  According to Smith, Plaintiff was also told at that time that she could take ten-minute typing breaks. (Smith Dep.  p. 148).

From April 11, 2006 until October 18, 2006, Plaintiff received treatment from the City's doctors for pain in her right wrist, finger and forefingers, and pain in her left hand and left forehand. (Plaintiff Dep. pp.104-09).  After her initial evaluation on April 11, 2006, a doctor for the City completed a Certificate releasing Plaintiff to return to work on full duty that day.  (Plaintiff Dep. DX4 (Doc. # 16-4, at 11)).  On June 7, 2006, a doctor for the City completed another Certificate which again released Plaintiff to return to work on full duty that day. (Smith Dep. PX21).  This time, however, the Certificate also specifically requested that Plaintiff be allotted a ten-minute rest break

---

[7]    The court refers to the assistance sought by, and provided to, Plaintiff as "accommodations" because that is the word used in the cited testimony.   However, by using that term, the court does not mean to suggest that these forms of assistance, which were provided years before the institution of this lawsuit, qualified as "reasonable accommodations" within the meaning of the ADA.  Although Plaintiff asserts that "Defendant openly admits that it provided plaintiff with *accommodations* in the past" (Doc. # 27, at 3 (emphasis added)), the evidence indicates otherwise. Frazier reiterated during his deposition that "accommodation" was "[Plaintiff]'s word," not the City's term.  (Frazier Dep. p. 145).  The court expresses no opinion as to whether prior forms of assistance qualified as accommodations pursuant to the ADA.

6

per hour of data entry.  (Smith Dep. PX21). On July 10, 2006, September 27, 2006, and October 24, 2006, City doctors completed additional Certificates, each of which released Plaintiff to return to work on full duty with a request that she be allotted ten-minute rest breaks for each hour of typing. (Smith Dep. PX22; Smith Dep. PX23; Smith Dep. PX8 (respectively)).  City doctors also prescribed braces for Plaintiff's arms and a half cast to wear while she was working. (Plaintiff Dep. p. 105).

All City employees receive two breaks each day of fifteen or twenty minutes each. (Frazier Dep. p. 138; Smith Dep. p. 149).  According to Smith, the City Clerk's Department also routinely allows its employees to take ten-minute typing breaks as needed.  (Smith Dep. pp. 101, 148-49). Smith further testified that sometime during the course of Plaintiff's treatment by City doctors, but prior to April 11, 2006, the City had particularly authorized Plaintiff to take ten-minute typing breaks.  (Smith Dep. pp. 96, 97, 148-49).  According to Frazier, that allowance for ten-minute typing breaks was not a special "accommodation" because "everyone gets breaks" and Plaintiff "didn't do repetitive typing throughout [the day]."  (Frazier Dep. pp. 137-39).

**B.     The File Cabinet Request and Subsequent Sick Leave**

On October 17, 2006, Lee Frazier sent an email to several employees including Plaintiff reminding them to "empty your file cabinets . . . for preparation of the installation of carpet in the office . . . ." (Plaintiff Dep. DX5 (Doc. # 16-4, at 13)).  Just under an hour later, Plaintiff responded via email to Frazier as follows:

> I have informed Ms. Smith that I am NOT able to empty the file cabinet due to the severity of the pain in my wrist, hand and forearm.  That is why I am only able to type for a few minutes at a time.  I informed her that should it need to be emptied then she should make arrangements to get it done.

(Plaintiff Dep. DX5 (Doc. # 16-4, at 13)). Smith testified that she needed Plaintiff to empty her file cabinet just like everyone else so that the office would be prepared for the renovation.  (Smith Dep. pp. 43-46).  Frazier testified that "if something else was in [the file cabinet] that [Plaintiff] didn't think she could empty, then she should have come and asked [them] about that," and Frazier "would have gotten it for her." (Frazier Dep. pp. 84-85).  According to Frazier, Smith's request that Plaintiff empty her file cabinet would have fallen into a "catch-all" or "other" category of Plaintiff's job description.  (Frazier Dep. pp. 85-86).

On October 18, 2006, Frazier send a memorandum to Plaintiff, with copies to Smith and Ann Thompson, Director of Personnel, informing her:

> In your email dated October 17, 2006 . . . you stated that you have an injury and/or medical condition that places limitations on your ability to perform essential functions related to your job.  The employees of the City Clerk's Office if sick, injured and/or under the care of a physician must be cleared to work without limitations before being permitted to work.  Thus, in the best interest of the City and yourself, **effective immediately** you are being placed off work on sick leave, until such time as you can provide a statement from your personal physician describing the nature of the condition you claim renders you unable to perform the essential functions of your job and that outlines the limitations you have as a result of your condition.

(Plaintiff Dep. DX5 (Doc. # 16-4, at 14))(emphasis in original).  Frazier explained that, as Smith's Deputy Clerk, he consults with her regarding employment decisions.  (Frazier Dep. p. 59).  With respect to the decision to send Plaintiff home on October 18, Frazier "consulted with [Smith] and [he] made the decision and she acquiesced to the decision."  (Frazier Dep. p. 61).

Plaintiff testified that she never asked to leave work on October 18, nor did she ever tell Frazier or Smith that she would not come back to work after she was placed on leave.  (Plaintiff Dep. pp. 115-16).  Plaintiff understood Frazier's memorandum to mean that she "would have to be cleared

to perform my job without any limitations" in order to return to work in any capacity, and she began "call[ing] around" to find a physician who could accomplish that. (Plaintiff Dep. p. 110).  Plaintiff also asked Frazier: "why would I have to see my personal physician and use my own personal sick leave when I was still under the care of the City doctor."  (Plaintiff Dep. p. 112).  According to Plaintiff, Frazier responded: "I don't care who you go see.  You've just got to see a doctor and give us something stating that you can work without limitations."  (Plaintiff Dep. p. 112-13).

Frazier explained that because Plaintiff's refusal to empty the file cabinet referenced an "injury," and because the City doctor had already "cleared" her to return to full duty, he placed her on sick leave "to get an evaluation" so that the City "would know how best to handle the situation." (Frazier Dep. pp. 53-58). According to Frazier, he did not know if the condition for which Plaintiff had received treatment from the City doctor was the same condition referenced in her October 17 email.  (Frazier Dep. pp. 98-101, 121-22).[8]  Frazier noted that although the Certificates completed by the City doctors after April 2006 requested that Plaintiff be given ten-minute typing breaks, they nevertheless released her to full duty and contained no mention of a limitation on unloading file cabinets in particular or lifting in general. (Frazier Dep. pp. 135-38).

---

[8] Frazier testified as follows:

Q:    So, despite the fact that she had a long history of providing you with documentation that said she was having pain in her arms and despite the fact she had written you an E-mail that said she would not be able to [empty the file cabinet] because of the pain in her arms and despite the fact that you understood that she was under a treatment plan, you thought this was something different?

A:    To my knowledge, [Plaintiff] was cleared in April . . . for full work without accommodations.

(Frazier Dep. p. 122).

On October 24, 2006, Plaintiff kept her previously scheduled appointment with the City's doctor, and he indicated on a Certificate, as City doctors had before, that she could return to full duty, albeit with the same request that she be allowed ten-minute typing breaks per hour. (Plaintiff Dep. pp. 110, 113; Smith Dep. PX8). The City doctor also released her to her "personal physician as discussed." (Smith Dep. PX8). According to Plaintiff, Frazier refused to accept the October Certificate as satisfaction of his request for documentation from a physician regarding her injury. (Plaintiff Dep. p. 113).[9]

On November 3, 2006, Plaintiff, who was a participant in the Retirement and Relief System of the City of Birmingham (hereinafter, "the Pension Board"), applied for ordinary and extraordinary disability benefits. (Plaintiff Dep. pp. 57-58, DX12). The Pension Board later denied that application,[10] and Plaintiff filed a lawsuit in the Circuit Court of Jefferson County against the Pension Board claiming her entitlement to benefits. (Plaintiff Dep. pp. 57-58, DX3, DX13). The state court eventually ruled that Plaintiff was not entitled to any disability benefits. (Doc. # 16-6, at 1).

---

[9] It is unclear *when* the City received this particular Certificate (Frazier Dep. pp. 91-92, 125-27), although it is clear that the City received it *at some point* prior to March 21, 2007, as it was referenced in Smith's March 21, 2007 letter to Plaintiff (Plaintiff Dep. DX15), and became part of her personnel file maintained by Frazier (Frazier Dep. pp. 26, 96, 106-07).

[10] On December 20, 2006, Dr. Bruce Romeo, a medical doctor contracted by the Pension Board, evaluated Plaintiff and concluded that her injuries were not work-related. (Romeo Dep. pp. 10-11, 13-14). Dr. Romeo also opined that Plaintiff could be expected to fulfill her job duties with proper accommodations. (Romeo Dep. pp.13-15). However, as discussed in Section IV. A., *infra*, neither Dr. Romeo's opinion, nor the Pension Board's denial, nor the State Court's review thereof, is relevant to - or binding in - this case.

On November 14, 2006, Frazier sent Plaintiff a letter informing her:

You have been on sick with pay leave since October 18, 2006. We have not heard from you or received any information as to your work status. Therefore . . . you are required to submit documentation substantiating your sick leave (from a Certified Physician) usage [sic] no later than November 26, 2006. . . . Furthermore, please note that on December 1, 2006 you will have exhausted all leave time . . . . [and then] are required to apply for a leave of absence without pay.

(Plaintiff Dep. DX6).

### C.    Plaintiff's November 16, 2006 Response to Frazier's Request for Documentation Substantiating Her Sick Leave

Two days later on November 16, Plaintiff responded to Frazier with a lengthy letter stating that she was on sick with pay leave "only because I was told by you, that I could not work because I was unable to perform the essential functions of my job, *i.e.*, unloading a filing cabinet." (Plaintiff Dep. DX7). Plaintiff expressed surprise that she was not offered any assistance or "accommodation" in unloading her file cabinet in light of what she perceived to be previous accommodations allowed by Smith and/or Frazier for the same type of injury. (Plaintiff Dep. DX7).

Plaintiff also clarified her belief, based upon the statements in Frazier's October 18 memorandum, that she "would not be allowed to work until I was cleared to work **without limitations** and that I would have to see my **personal physician**." (Plaintiff Dep. DX7)(emphasis in original). Accordingly, Plaintiff explained that she had not returned to work yet because the City doctor had renewed the recommendation that she "take ten minute breaks every hour of typing, which is a **limitation** on an essential part of [the] job" and because she "could not get an appointment with a **personal physician** until November 14, 2006." (Plaintiff Dep. DX7)(emphasis in original).

11

Plaintiff's November 16, 2006 letter also enclosed a "Request for Leave of Absence" for unpaid leave after the exhaustion of her paid time, which Plaintiff stated was based upon her belief that she still could not return to work because she was "unable to work **without limitations**." (Plaintiff Dep. pp. 39-40, DX7 (emphasis in original), DX8).  Dr. Joseph Sherrill, Plaintiff's orthopaedic surgeon, served as the physician to "verify the necessity" of the leave request, although instead of completing the form, he attached a separate statement that he was currently treating Plaintiff for "cubital tunnel of the right elbow." (Plaintiff DX8 (Doc. # 16-4, at 21-22).  Plaintiff's letter also requested that she be placed on paid injury leave because "the pain I am experiencing resulted from an on-the-job injury."  (Plaintiff Dep. DX7).

Frazier stated that after reading Plaintiff's letter, he felt "no need to clarify that she could come back if she had clearance from . . . . her personal physician."  (Frazier Dep. pp. 132-33).  Frazier also stated that "accommodation" is "[Plaintiff]'s word," and he explained that he felt no obligation to respond to her allegation that Defendant failed to accommodate or assist her with the file cabinet.  (Frazier Dep. p. 145).

### D.    Correspondence Between the Parties During the Next Four Months

On November 28, 2006, Smith wrote Plaintiff to inform her that her leave request was "incomplete" because a physician certification had not been completed.  (Plaintiff Dep. DX9).  Thereafter on December 3, 2006, Plaintiff submitted a new Request for Leave of Absence completed by Dr. Nova Law, who stated that Plaintiff would be incapacitated until February 28, 2007.  (Plaintiff Dep. DX10).  According to Plaintiff, Dr. Law requested "[a]bout 12 weeks because -- [] that's why we came up with it because you're able to apply for the 12 weeks of [Family and Medical Leave Act] leave." (Plaintiff Dep. p. 45).  Plaintiff therefore requested leave for temporary disability and Family

12

and Medical Leave, indicating - with question marks - that she intended "to return to full duty on 03/01/07 ??" (Plaintiff Dep. DX10 (Doc. # 16-4, at 25)).

On February 28, 2007, Plaintiff met in person with Frazier and Smith. (Smith Dep. p. 136; Plaintiff Dep. p. 52-56, DX11; Plaintiff Aff., at ¶¶ 20-21). During that meeting, Plaintiff talked with Frazier and Smith "about the extension of her leave . . . . [and that she] was still suffering from the pain from those on-the-job injuries." (Plaintiff Dep. pp. 54-55). At no point during that meeting, or at any other time, did Smith tell Plaintiff to come back to work or express that the City wanted her to come back to work. (Smith Dep. p. 136, 143).[11]  Although Frazier testified that Plaintiff's assertion that he had refused to let her come back to work was a mis-characterization (Frazier Dep. pp. 150-51), he did not think he needed to respond to it because "the information was [being] requested again a second time." (Frazier Dep. p. 151).

On March 2, 2007, Frazier sent Plaintiff a letter stating that her Family and Medical Leave had been exhausted as of March 1, 2007, and that the City considered her to be "Absent Without Leave" because she had given the City no indication that she intended to resign. (Plaintiff Dep. DX 11). The letter enclosed a blank leave request form "in the event you desire to apply for an extension of your previously granted Medical Leave." (Plaintiff Dep. DX11).

Two weeks later on March 16, 2007, Plaintiff responded as follows:

In your letter you requested that I provide you with a written statement of my plans on continuation of employment. **In previous communications you stated that I could not return to work unless I could do so without limitations. I have never**

---

[11] Although Defendant's brief represents that during the meeting "other positions were offered to . . . . [Plaintiff which she] refused" (Doc. # 16, at 5, ¶ 13), the evidence cited by Defendant does not support that assertion, and the court has identified no evidence in the record even suggesting that other positions were offered to Plaintiff *at any time*. Plaintiff denies that any such offers were ever made. (Plaintiff Aff., at ¶¶ 19-21).

13

**refused to return to work.  I have merely asked that you make accommodations for my work related injuries . . . . I have taken leave at your request** . . . . Since I am continuing to suffer severe pain from the effects of the work related injuries and you refuse to clear me to return to work unless I have no limitations, I feel I am forced to seek an extension of my medical leave.

(Plaintiff Dep. DX14)(emphasis added).  Plaintiff's letter enclosed an additional request for leave based upon Dr. Law's certification that Plaintiff would be incapacitated from March 1, 2007 until June 30, 2007.  (Plaintiff Dep. DX14 (Doc. # 16-5, at 4-5)).

> **E.**     **Defendant's Communication to Plaintiff That Her Leave Would Not Be Approved Until She Submitted a Physician Statement**

On March 21, 2007, Smith informed Plaintiff via letter that because "[t]he City's physician . . . returned you to work without restrictions on April 11, 2006 [] and released you entirely from his care on October 24, 2006 [] . . .," her leave requests would not be approved until she  "submit[ted] a statement from [her] personal physician **describing the nature of the condition which renders [her] unable to perform the essential functions of [her] job and outlines the limitations [she] ha[s] as a result of [her] condition**. (Plaintiff Dep. DX15)(emphasis in original).

On April 5, 2007, Plaintiff responded by letter to Smith expressing surprise that the lack of documentation of her limitations "was not pointed out to me . . . when I was initially granted leave on December 1, 2006."  (Plaintiff Dep. DX16).  Plaintiff also highlighted the fact that the October 24, 2006 Certification from the City's doctor actually included the previously-made request that Plaintiff be given ten-minute breaks for every hour of typing.  (Plaintiff Dep. DX15).  Plaintiff stated that she had enclosed "information from my physician outlining my restrictions and limitations as they relate to my job duties" and concluded that "**[s]ince these limitations prevent me from doing my essential duties as assigned at this time, and Mr. Frazier's memo stated that I had to be**

14

**cleared to work without limitations before being permitted work, I am resubmitting my request for an extension of my medical leave for your consideration.**"  (Plaintiff Dep. DX16)(emphasis added).  Attached to the letter was the previously submitted request for a leave of absence until June 30, 2007, and a "Treatment/Work Status Form" completed by Dr. Sherrill which diagnosed Plaintiff with Cubital Tunnel Syndrome of the right elbow and DeQuervains of the bilateral wrist and prescribed return to work with "no heavy lifting, no typing, no twisting of bilateral wrist, or grasping with bilateral hands."  (Plaintiff Dep. DX17, DX16 (Doc. # 16-5, at 20)).

On April 18, 2007, Smith informed Plaintiff that her temporary disability leave request was denied, although she noted that the City had approved personal leave without pay through June 30, 2007.  (Plaintiff Dep. DX18).

    **F.**    **The Expiration of Plaintiff's Personal Leave and Initiation of Disciplinary Action Against Her**

On June 21, 2007, Smith sent Plaintiff a letter advising that Plaintiff's personal leave was expiring and requesting "a written statement as it relates to your plans on continuation of employment with the City."  (Plaintiff Dep. DX19).  On July 6, 2007, Plaintiff responded to Smith that she had intended "to work my 30 years and then retire" but felt thwarted because "**you have refused to clear me to return to work unless I have no limitations**."  (Plaintiff Dep. DX20)(emphasis added).  Plaintiff expressed her belief that she was being "force[d] out of my position due to my [] injuries" and notified the City that she had retained an attorney.  (Plaintiff Dep. DX20).

On August 13, 2007, Plaintiff was informed that personnel action was being contemplated against her because she remained absent without leave after the expiration of her leave on June 30,

15

2007. (Plaintiff Dep. DX21 (Doc. # 16-5, at 35)).   A determination hearing on the proposed disciplinary action was held on August 23, 2007, and Plaintiff and her attorney attended. (Plaintiff Dep. DX21).   Thereafter, Plaintiff was found to have violated Jefferson County Personnel Board rules and regulations by remaining absent without leave, and she was informed on August 27, 2007 that her employment was terminated. (Plaintiff Dep. DX21 (Doc. # 16-5, at 34)).

Plaintiff did not file an appeal with the Board regarding her discharge, nor did she exercise any other administrative remedies. (Plaintiff Dep. pp. 91-92).   Instead, Plaintiff filed an EEOC charge on September 6, 2007, and on February 27, 2008, she received a Notice of Right to Sue. (Plaintiff Dep. DX22, DX23).  This lawsuit followed on May 20, 2008.  (Doc. # 1).[12]

## III.    Potential Impact of the ADA Amendments Act of 2008

Before moving to the substantive analysis of Plaintiff's claims, the court must address a crucial threshold matter.  After the occurrence of the allegedly unlawful conduct at issue in this case, and after the filing of this lawsuit, the ADA Amendments Act of 2008 (hereinafter the "ADAAA" or "the Amendments") was signed into law on September 25, 2008 and became effective on January 1, 2009.  *See* Pub.L. No. 110-325, § 8, 122 Stat. 3553, 3559.  The ADAAA amends the Americans with Disabilities Act in important respects and its application to this case is hotly disputed–most notably, the definition and construction of "disability" under the statute.  Indeed, the changes made by the ADAAA are potentially *outcome-determinative* here.

---

[12] Plaintiff has also filed a lawsuit against the City in the Circuit Court of Jefferson County, Alabama, alleging retaliatory discharge under § 25-5-11.1 of the Alabama Workers' Compensation Act. (Plaintiff Dep. DX3).

16

While the amended definition of "disability" retains largely the same language under the ADAAA, including definitional subparts (A)-(C),[13] Congress supplemented subpart (C) - the "regarded as" prong - with a provision expressing its intended scope. The amended version specifically proscribes courts from demanding that a "regarded as" plaintiff demonstrate the impairment at issue limited a life activity – a pre-Amendments requirement which was acknowledged by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Instead, the ADAAA specifies:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not the* impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A))(emphasis added); *see also id.* at § 12102(3)(B)) ("[The 'regarded as' prong of § 12102(1) ] shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.").

Thus, the salient question here is this:  does the ADAAA apply retroactively to govern conduct occurring before that amendment became effective, like the conduct at issue in this case? It appears that the Eleventh Circuit has not yet answered this question of ADAAA retroactivity.  In an unpublished opinion[14] issued after the ADAAA effective date, but involving pre-Amendments conduct, a *per curiam* Eleventh Circuit decision cited to "[t]he ADA, as amended" without any

---

[13] Disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

[14] Unpublished Eleventh Circuit decisions are only persuasive, not binding, authority. 11th Cir. Rule 36-2.

17

mention of the retroactivity question, noting only that "[r]ecent amendments to the Americans with Disabilities Act . . . became effective on 1 January 2009." *Keeler v. Florida Dept. of Health*, 324 Fed.Appx.850, 856 & n.5 (11th Cir. April 27, 2009). A little over two weeks earlier, however, another unpublished, *per curiam* Eleventh Circuit opinion addressed whether the pre-ADAAA statute applied to pre-Amendments conduct, noting: "Congress recently enacted major changes to the ADA . . . . [but] absent Congressional expression to the contrary, a presumption against retroactive application applies . . . . So, we look to the ADA as it was in effect at the time of the alleged discrimination. *Fikes v. Wal-Mart, Inc.*, 322 Fed.Appx. 882, 883 n.1 (11th Cir. April 10, 2009). A few months later in June 2009, yet another *per curiam* Eleventh Circuit decision observed: "This court has not yet issued a published opinion addressing the potential retroactive effect of the ADAAA, and need not do so here because Shannon has not established that he is a 'qualified individual.'" *Shannon v. Potter*, No. 08-16827, 2009 WL 1598442, at *2 n.5 (11th Cir. June 9, 2009). Thus, at least in this Circuit, the matter of retroactivity seems yet to be decided.[15]

Despite the potential impact of the ADAAA on this case, and the lack of a binding Eleventh Circuit ruling on retroactivity, neither of the parties addressed this issue in their summary judgment motions – both of which were filed almost two months *after* the effective date of the Act. The court therefore raises the issue of retroactivity *sua sponte*.

---

[15] At least one other judge of this court has reached the same conclusion. *See Richardson v. Honda Manufacturing of Alabama, LLC,* No. 1:07-CV-2038-VEH, 2009 WL 2171113, at *5 (N.D.Ala. July 22, 2009)("Based upon this court's independent research, it appears that the issue of any retroactive application relating to the ADAAA is still an open question within the Eleventh Circuit.").

The Supreme Court has recognized the tension inherent between two principles of statutory application that impact retroactivity: "Although we have long embraced a presumption against statutory retroactivity, for just as long we have recognized that, in many situations, a court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit." *Landgraf v. USI Film Products*, 511 U.S. 244, 273 (U.S. 1994) (internal quotations and citations omitted). Thus, the Court provided the following map for navigating these disorienting waters:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf*, 511 U.S. at 280.

### A.    Congressional Expression of the Statute's Reach

In this case, therefore, the court's first charge under *Landgraf* and its progeny is to examine the statute for an "express command regarding the temporal reach of the statute or, in the absence of language as helpful as that, [to] determine whether a comparably firm conclusion can be reached . . . ." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006)(internal citations and quotations omitted). An examination of the text of the ADAAA reveals no explicit provision addressing retroactivity or stating that the statute should be applied to cases pending at the time it was enacted.

To the contrary, the statute states that it "shall become effective on January 1, 2009." Pub.L. No. 110-325, § 8, 122 Stat. 3553, 3559.

Here, Congress did not "expressly prescribe [ ]" whether the ADAAA should reach back to cover pre-Amendments conduct. *Landgraf*, 511 U.S. at 280. Instead, Congress delayed the effective date of the statute so that there existed a three-month gap between enactment on September 25, 2008 and effectivity on January 1, 2009. The court agrees with the D.C. Circuit's reasoning that, "[b]y delaying the effective date of the ADAAA, the Congress clearly indicated the statute would apply only from January 1, 2009 forward. If the Congress intended merely to 'clarify' the ADA, then its decision to delay the effective date would make no sense . . . ." *Lytes v. DC Water and Sewer Authority*, 572 F.3d 936, 940 (D.C. Cir. July 21, 2009).

Although statutory notes indicate that Congress intended to overrule certain Supreme Court decisions with the ADAAA and thus "reinstat[e] a broad scope of protection to be available under the ADA," Section 2(b)(1), 122 Stat. 3553, 3554,[16] that is not enough to warrant retroactive

---

[16] The statutory notes provide, in pertinent part:

SEC. 2. FINDINGS AND PURPOSES.

(b) PURPOSES.--The purposes of this Act are--

(1)  to carry out the ADA's objectives of providing "a clear and comprehensive national mandate for the elimination of discrimination" and "clear, strong, consistent, enforceable standards addressing discrimination" by reinstating a broad scope of protection to be available under the ADA;

(2)  to reject the requirement enunciated by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;

(3)  to reject the Supreme Court's reasoning in *Sutton v. United Air Lines,*

application.  The "decision [by Congress] to alter the rule of law" established in a judicial opinion,

to "'legislatively overrul[e],'" . . . does not, by itself, reveal whether Congress intends the 'overruling'

statute to apply retroactively to events that would otherwise be governed by the judicial decision."

*Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304-05 (1994).[17]  In other words, a "restorative" purpose

> *Inc.*, 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

> (4)  to reject the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives";

> (5)  to convey congressional intent that the standard created by the Supreme Court in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and

> (6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term "substantially limits" as "significantly restricted" to be consistent with this Act, including the amendments made by this Act.

122 Stat 3553, 3554.

[17]  The Court recognized in *Rivers* that Congress' decision to respond to certain judicial decisions could be motivated by a multitude of purposes:

> A legislative response does not necessarily indicate that Congress viewed the judicial decision as "wrongly decided" as an interpretive matter. Congress may view the

is not presumptive of retroactivity.[18]  "We still require clear evidence of intent to impose [a] restorative statute 'retroactively.'" *Rivers*, 511 U.S. at 311.  Such clear evidence is lacking here.

**B.     Potential Retroactive Effect of the Statute**

Having found neither an "express command regarding the temporal reach" of the ADAAA, nor evidence suggestive of a "comparably firm conclusion," *Fernandez-Vargas*, 548 U.S. at 37, the court moves to the second prong of the *Landgraf* analysis: if applied to pre-enactment cases, would the ADAAA have "retroactive effect" such that "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed"?  *Landgraf*, 511 U.S. at 280.  The answer here is emphatically "yes."  By enacting the ADAAA, Congress broadened the definition of "disability," expanding the class of individuals who would be entitled to ADA protection.  Indeed, this is just such a case where there

_____

> judicial decision as an entirely correct reading of prior law - or it may be altogether indifferent to the decision's technical merits - but may nevertheless decide that the old law should be amended, but only for the future. Of course, Congress may also decide to announce a new rule that operates retroactively to govern the rights of parties whose rights would otherwise be subject to the rule announced in the judicial decision. Because retroactivity raises special policy concerns, the choice to enact a statute that responds to a judicial decision is quite distinct from the choice to make the responding statute retroactive.

*Rivers*, 511 U.S. at 305.

> [18] As the Supreme Court explained:
>
> Congress, of course, has the power to amend a statute that it believes we have misconstrued. It may even, within broad constitutional bounds, make such a change retroactive and thereby undo what it perceives to be the undesirable past consequences of a misinterpretation of its work product. No such change, however, has the force of law unless it is implemented through legislation.

*Rivers*, 511 U.S. at 313.

would be a truly retroactive effect – where an analysis of Plaintiff's claims pre-ADAAA and post-ADAAA might well result in different outcomes.  It could be said that application of the ADAAA to the pre-enactment conduct in this case would increase Defendant's liability.

Accordingly, because the court cannot find that Congressional "intent to reach conduct preceding the 'corrective' amendment ... clearly appear[s]" in the ADAAA, *Rivers*, 511 U.S. at 313, it is compelled to conclude that the ADAAA does not apply to conduct that occurred prior to its effective date.  Of note, the court's conclusion is consistent with decisions of other Circuit courts that have addressed the issue.  *See EEOC v. Agro Distrib. LLC*, 555 F.3d 462, 469 n. 8 (5th Cir. January 15, 2009)("Congress recently enacted the ADA Amendments Act of 2008 . . . but these changes do not apply retroactively.") *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. July 2, 2009)("The recently-enacted ADA Amendments Act of 2008 does not govern this case because its application would have the type of impermissibly retroactive effect that requires a clearly-stated congressional intent"); *Kiesewetter v. Caterpillar, Inc.,* 295 F. App'x 850, 851 (7th Cir. 2008)("After the district court entered its judgment, Congress amended the ADA's definition of 'disability.' . . . [The] statute provides that the legislation's effective date is January 1, 2009, so it does not apply to this appeal); *Lytes*, 572 F.3d at 940-41.

Having resolved the matter of potential applicability of the ADAAA, the court proceeds to its substantive analysis of Plaintiff's claims under the pre-Amendments ADA and case law interpreting it.

IV.     **Analysis of the ADA Discrimination Claim**

The ADA[19] prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Discrimination under the ADA may take the form of a disparate treatment claim, or it may consist of the allegation that a defendant failed to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).  A claim for failure to make reasonable accommodations, however, requires that a plaintiff not only set forth the discrimination *prima facie* case, but also identify a reasonable accommodation that would allow her to perform the job. *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998).

In the instant action, Plaintiff brings both disparate treatment and failure to accommodate claims.  The *prima facie* case required for both types of discrimination requires proof that Plaintiff: "(1) [] has a disability; (2) [] is a qualified individual; and (3) [] was subjected to unlawful discrimination because of her disability." *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996).  In the instant motion, Defendant challenges Plaintiff's ability to prove both the first and last elements of her *prima facie* case.  However, because the court finds that Plaintiff has not demonstrated that she has a " disability" within the meaning of the ADA under the first element, the remaining disputed element of her *prima facie* case need not be addressed.

---

[19] The standards for liability under the Rehabilitation Act serve as precedent for cases under the ADA and vice versa. *Cash v. Smith*, 231 F.3d 1301, 1305 n. 2 (11th Cir. 2000).

An individual is "disabled" within the meaning of the ADA when she possesses any one of the following: (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). A "major life activity" may include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(1).[20] A "substantial limitation" occurs when a plaintiff is "[s]ignificantly restricted as to the condition, manner or duration under which . . . [she] can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at § 1630.2(j)(1)(ii).

Importantly, the determination of whether a person is disabled "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Sutton*, 527 U.S. at 483. When conducting that analysis, a court should consider: "'(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact ... from the impairment.'" *Garrett v. University of Alabama at Birmingham Board of Trustees,* 507 F.3d 1306, 1311 (11th Cir. 2007) (quoting 29 C.F.R. § 1630.2(j)(2)).

In this case, Plaintiff claims that she is disabled under both subparts (A) and (C) of the definition. The court will address each contention in turn, although a procedural argument merits attention first.

---

[20] EEOC interpretive guidelines, "'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance . . . .'" *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986).

A.        **Collateral Estoppel**

As a threshold matter, the court rejects what appears to be a collateral estoppel argument asserted by Defendant that Plaintiff is procedurally prevented from challenging whether she is disabled under the ADA:

> In addition, the Plaintiff completely ignores the ruling of the Circuit Court [of Jefferson County on Plaintiff's Writ of Mandamus against the Pension Board] that she was not disabled nor entitled to disability benefits.  A prior judicial decision has determined that the Plaintiff is not disabled or entitled to disability benefits.

(Doc. # 24, at 15; *see also* Doc. # 16, at 16-17; Doc. # 26, at 8).  To invoke collateral estoppel or "issue preclusion" against Plaintiff, Defendant must demonstrate:  (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue.  *In re McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989).

This is not a close call.  Defendant does not even mention - much less address - the requirements of collateral estoppel, and they are not satisfied in this case.  There is simply no evidence that the matter of disability under the ADA is "identical" to the question that was at issue in the state court proceeding of whether the Pension Board abused its discretion in denying Plaintiff disability benefits, which is governed by the Pension Act, Ala. Acts 1973, Act No. 1273.  Plaintiff points out that "[the Pension Act] does not define disability.  Nor does it make reference to, adopt or even substantively mirror the Americans with Disabilities Act."  (Doc. # 25, at 27).  But even if it did, the record is devoid of *any* evidence that the matter of disability under the ADA was litigated, determined, or essential in Plaintiff's state court proceeding.

26

Courts of this Circuit have recognized that there are multiple definitions of disability in use in state and federal law.  *See e.g. Sumner v. Michelin N. Am.*, 966 F. Supp. 1567, 1574 (M.D. Ala. 1997) (outlining the differences in the definition of disability used by the ADA, the Social Security Act and the Alabama Workers' Compensation Act); *see also Talavera v. School Bd. of Palm Beach County*, 129 F.3d 1214, 1220 (11th Cir. 1997)(agreeing "with the majority of our sister circuits that a certification of total disability on an SSD benefits application is not inherently inconsistent with being a 'qualified individual with a disability' under the ADA and rejecting the district court's application of a *per se* rule of judicial estoppel).  It would be an impermissible reach of this court's authority to conclude that the ADA and Pension Act standards for evaluating disability are sufficiently similar to warrant collateral estoppel.  To do so would thwart the unique legislative purpose of each of those Acts.  As Plaintiff observes:

> [T]he [P]ension [R]elief [A]ct serves an entirely different purpose than the ADA. The purpose of the Pension Act is to compensate employees for lost wages, not determine whether an employee is eligible for a reasonable accommodation.  The Pension Act has two provisions that control whether a disability is compensable. In order to receive ordinary disability the employee must show that she has  become ***"totally disabled*** to perform his/her customary duties as an employee of the City and not be entitled to an extraordinary disability allowance"... that employee may then receive benefits "until such time as said participant is no longer totally disabled to perform his/her said customary duties" 1273 Ala. Acts 1973. § 7. In order for an employee to receive extraordinary benefits, the employee must become "***totally disabled*** to perform his/her customary duties by reason of personal injury received as a result of an accident arising out of and in the course of his/her employment in the service and occurring at a definite time and place[.]".... 1273 Ala. Acts 1973 §8.

(Doc.# 25, at 26-28)(emphasis in original).  There is no justification for the application of collateral estoppel in this case.

For all of these reasons, Plaintiff is not procedural barred from arguing that she is not disabled under the ADA.  The court now turns to the parties' substantive arguments regarding subparts (A) and (C) of the ADA definition of disability.

**B.      Impairment That Substantially Limits One or More of the Major Life Activities**

Pursuant to definitional subpart (A), Plaintiff contends that her arm and hand impairments substantially limit her in two major life activities: (1) performing manual tasks; and (2) working. Each of these activities requires a unique analysis.

**1.      Performing Manual Tasks**

The Supreme Court has held that in order for an impairment affecting the performance of manual tasks to qualify as a disability, it must prevent or severely restrict the performance of activities "of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)(rejecting the plaintiff's argument that her carpal tunnel syndrome limited her ability to perform a broad class of manual tasks and thus impaired a major life activity).  Thus, "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Toyota Motor*, 534 U.S. at 200-01.  Moreover, the impairment must have a permanent or long-term impact.  *Toyota Motor*, 534 U.S. at 197.

Here, Plaintiff claims "that she is limited in the major life activity of performing manual tasks like writing, gripping and lifting . . . . [as indicated by the fact] that [she] has difficulty writing, cannot lift groceries or heavy items with her right hand and is unable to drive long distances."  (Doc. # 18, at 13; Doc. # 25, at 15).  Unfortunately for Plaintiff, her testimony makes clear that her inability

28

to perform some manual tasks is nothing more than "diminished activity tolerance," which this Circuit has held insufficient to establish the "statutorily required substantial limitation." *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222-23 (11th Cir.2000).

In *Chanda*, a plaintiff with tendinitis alleged that he could no longer perform manual tasks including "turning handles, grasping, holding or lifting objects, using a computer or writing with a pen." *Chanda*, 234 F.3d at 1222. At the same time, however, his testimony indicated the "ability to assist his spouse with household activities, to dress and feed himself, and to drive an automobile." *Chanda*, 234 F.3d at 1222. The court concluded:

> We are persuaded that a plaintiff must demonstrate that he is substantially limited in a range of manual tasks rather than a narrow category thereof. Chanda's only restrictions that were severe, of lengthy duration, and with a long term impact were related to a narrow category of tasks, such as typing or cutting foamboard for an extensive period of time. He acknowledged that he could perform daily activities, including dressing himself, driving, and attending classes or working in a position requiring computer usage. We must conclude that while his tendinitis constitutes an impairment, it falls short of substantially limiting the major life activity of performing manual tasks.

*Chanda*, 234 F.3d at 1223 (internal footnotes omitted); *see also Hillburn v. Murata Elec. NA*, 181 F.3d 1220, 1228 (11th Cir. 1999)(holding that a plaintiff with coronary heart disease was not substantially limited in the major life activity of manual tasks because she admitted that she was able to bathe, dress herself, work around the house, cook, and work).

Just as in *Chandra*, Plaintiff still is able to perform a range of manual tasks, indicating that her ability may be diminished but is not *substantially* limited.[21] Although Plaintiff testified that she

---

[21] This is not a case "analogous to those in which the plaintiff has lost an entire arm or hand." *Calvo v. Walgreens Corp.*, No. 08-16229, 2009 WL 2435700, at *3 (11th Cir. August 11, 2009)(collecting cases and noting that Calvo's situation is "possibly [] even more severe . . . in light of her weakened right arm and the fact that her useless but painful left arm remains attached").

is unable to type for long periods of time or grasp a pen in the normal fashion (Plaintiff Dep. pp. 137-38; Plaintiff Aff., at ¶ 8), those restrictions are "related to a narrow category of tasks." *Chanda*, 234 F.3d at 1223.  Plaintiff has admitted that she can drive, albeit not "long distances." (Plaintiff Dep. pp. 137-38).   While Plaintiff experiences difficulty with cooking and cleaning, there is no indication that she is unable to feed herself, bathe, dress herself, or otherwise perform most of the tasks "of central importance to most people's daily lives."  Indeed, Plaintiff testified that her three grandchildren live with her and that she is able to care for them in her daughter's absence.  (Plaintiff Dep. pp. 14-16,127, 140-42). Considering all of this evidence in its entirety, the court concludes that Plaintiff has not established *substantial* limitation in the activity of performing manual tasks.

### 2.      Working

Plaintiff also contends that she is substantially limited in the major life activity of working. In this Circuit, the activity of "working" qualifies as a major life activity. *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004); *see also* 29 C.F.R. § 1630.2(I) (2003)(suggesting that major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working").[22] Nevertheless,

---

[22] As the court noted in *Carruthers*:

> The Supreme Court more recently has expressed its reluctance to treat impairment of one's ability to work as an ADA disability. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200, 122 S.Ct. 681, 692, 151 L.Ed.2d 615 (2002) ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."). Previously, however, this circuit has, following the ADA regulations and *Sutton* 's [] language, treated the activity of working as a major life activity. *See, e.g., Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000); *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911-12 (11th Cir. 1996). In the absence of a more explicit directive from the Supreme Court, we do not revisit that conclusion here.

"[t]he inability to perform a single, particular job" is not enough, 29 C.F.R. § 1630.2(j)(3)(I), even

if the single job precluded is the "individual's job of choice," *Carruthers*, 357 F.3d at 1216.

Indeed, "[i]f jobs utilizing an individual's skills (but perhaps not his or her unique talents) are

available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types

of jobs are available, one is not precluded from a broad range of jobs." *Sutton, Inc.*, 527 U.S. at 471.

Thus, in order to show a substantial limitation in the life activity of working, Plaintiff must

show that she is "significantly restricted in the ability to perform either a class of jobs or a broad

range of jobs in various classes as compared to the average person having comparable training, skills,

and abilities." 29 C.F.R. § 1630.2(j)(3)(I); *see also Sutton*, 527 U.S. at 491 ("When the major life

activity under consideration is that of working, the statutory phrase 'substantially limits' requires,

at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs."). A "class of

jobs" is defined as "'[t]he job from which the individual has been disqualified because of an

impairment, and the number and types of jobs utilizing similar training, knowledge, skills or

abilities, within that geographical area, from which the individual is also disqualified because of the

impairment.'" *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1370 (11th Cir. 1998) (quoting 29

C.F.R. § 1630.2(j)(3)(ii)(B)). A "broad range of jobs in various classes" is defined as "'[t]he job

from which the individual has been disqualified because of an impairment, and the number and types

of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical

area, from which the individual is also disqualified because of the impairment.'" *Boykin v. Honda

Mfg. of Alabama*, 288 Fed.Appx. 594, 597 (11th Cir. 2008)(quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)).

---

*Carruthers*, 357 F.3d at 1216 n. 2.

An analysis of the record evidence in this case reveals that Plaintiff is not substantially limited in her ability to work. Although Plaintiff may believe that she is precluded from performing "a broad range of positions that require manual dexterity and the ability to lift" because it is "difficult for her to even write with a pen . . . . [and she] cannot [type] without pain" (Doc. # 25, at 16; *see also* Doc. # 18, at 14), her work history suggests otherwise. Indeed, the very fact that Plaintiff was able "in the past, to continue working with the very disability upon which she relies in the instant suit" is evidence that she was not substantially limited in her ability to work. *Faust v. Pemco Aeroplex, Inc.* 226 Fed.Appx. 887, 889 (11th Cir. 2007). The evidence is uncontroverted that prior to October 18, 2006, when Frazier placed Plaintiff on sick leave, she was performing her job without significant restriction.[23]  *See Sicilia v. United Parcel Service, Inc.*, 279 Fed.Appx. 936, 939 (11th Cir. 2008) (finding that plaintiff was not substantially limited in working because "[e]ven with the doctor-imposed restrictions, [plaintiff] still can perform certain jobs"); *Carter v. Allied Insurance*,

---

[23] Even assuming that Plaintiff was restricted from lifting heavy items and from typing longer than 50 minutes without a break, those are not substantial limitations to her identified job duties. (*See* Plaintiff Dep. pp. 23-24; Smith Dep. DX5).

> That Plaintiff suffered some limitation [in working] is not enough; the limitation must be substantial . . . . Plaintiff's job responsibilities as a Wal-Mart assembler included assembling bicycles, grills, furniture, swing sets, and displays throughout the store. In addition, Plaintiff gave new employees tours of the store; and Plaintiff performed as the store's unofficial "handyman." In that capacity, Plaintiff did plumbing, electrical, welding, and carpentry work. Plaintiff even framed and sheet-rocked an office for Wal-Mart's district manager. This broad range of activity evidenced in the record stands in stark contrast to-and belies-Plaintiff's vague assertions that he is restricted in the major life activities of working and performing manual tasks. The district court concluded correctly that the evidence of Plaintiff's impairment was insufficient to show he was disabled for purposes of establishing a *prima facie* case.

*Fikes v. Wal-Mart, Inc.*, 322 Fed.Appx. 882, 884 (11th Cir. April 10, 2009).

No. 8:07CV235, 2008 WL 2228851, at *5 (D.Neb. 2008)(finding that plaintiff's carpal tunnel syndrome and cubital tunnel syndrome with permanent keying and lifting restrictions did not constitute a substantial limitation in the major life activity of working); *see also Boykin*, 288 Fed.Appx. at 597 (finding that "the fact that, at the time of his deposition, [plaintiff] was working two jobs hauling fertilizer and concrete, and was not under any medical restrictions with regard to those jobs or other jobs, shows that he is not disqualified from a broad range of jobs within various classes").

Moreover, the record is devoid of any *objective* evidence supporting Plaintiff's contention that she is foreclosed from performing jobs that require manual dexterity or the ability to lift. *Garrett,* 507 F.3d at 1315 ("While Dr. Miller asserts that [plaintiff] Garrett was precluded from performing medium or heavy jobs, he has not referenced any objective criteria supporting his conclusion. He did not identify any test that he performed, or required Garrett to perform, to determine the extent of her limitations."). And Plaintiff's reliance on her subjective belief that she is foreclosed from this range of jobs is not enough. The Eleventh Circuit "[has] previously held that testimony of limitations couched in vague terms is insufficient, particularly in the absence of evidence that a described affliction is worse than is suffered by many adults." *Garrett,* 507 F.3d at 1315 (citing *Rossbach v. City of Miami*, 371 F.3d 1354, 1359 (11th Cir. 2004)).

The Rule 56 evidence is insufficient to show that Plaintiff is precluded from performing a class or broad range of jobs, especially given her prior history of ability to work with the same impairments that form the basis of her ADA claims. For all of these reasons, Plaintiff has not established that she is disabled under subpart (A) of the ADA definition.

### B.       Regarded as Having Such an Impairment

Alternatively, Plaintiff claims that she is disabled because Defendant regarded her has having an impairment under subpart (C) of the statutory definition.[24]  Pursuant to this provision, a person is "disabled" if her employer "perceives her as having an ADA-qualifying disability, even if there is no factual basis for that perception." *Carruthers*, 357 F.3d at 1216 (citing *Williams v. Motorola, Inc.*, 303 F.3d 1284,1290 (11th Cir. 2002)). In other words, a plaintiff may be "regarded as" disabled in two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489.[25]

_____

[24] In opposition to Defendant's summary judgment, Plaintiff raises - for the first time - her contention that she is disabled because she has a "record" of impairment.  (*Compare* Doc. # 18, at 12-16 (contending that she is disabled under subparts (A) and (C) of the definition of disability) *with* Doc. # 25, at 16-17)(contending that she is disabled under subparts (A), (B), and (C) of the definition of disability)).  Even if Plaintiff had timely raised this argument and the court were to consider it, Plaintiff's assertion would fail for the same reasons that Plaintiff's claim under subpart (A) fails– because Plaintiff lacks record of an impairment with "with permanent or long term impact," *Garrett,* 507 F.3d at 1315, that substantially limited her in performing manual tasks and/or working.  *See Chanda,* 234 F.3d at 1224 n.33 (declining to address claim that plaintiff's medical documents show a record of impairment, but "noting [] in passing that [plaintiff's] problem would remain that "'the impairment indicated in the record must [still] be an impairment that would substantially limit one or more of the individual's major life activities.' 29 C.F.R. § 1630.2(k) (1997)").

[25] Put another way:

A plaintiff is "regarded as" being disabled if [s]he meets one of three conditions: (1) [s]he has a physical impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or (3) has no physical or mental impairment but is treated by an employer as having such an impairment.

*Rossbach v. City of Miami*, 371 F.3d 1354, 1360 (11th Cir. 2004)(citing 29 C.F.R. 1614.203(a)(5)).

"As with actual impairments, however, the perceived impairment must be one that, if real, would limit substantially a major life activity of the individual." *Carruthers*, 357 F.3d at 1216 (citing 42 U.S.C. § 12102(2)(C) and *Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir. 1999)). Thus, "for a plaintiff to prevail under this theory, [s]he must show two things: (1) that the perceived disability involves a major life activity; and (2) that the perceived disability is 'substantially limiting' and significant." *Rossbach*, 371 F.3d at 1360 (internal citations omitted).

Here, Plaintiff contends that Defendant perceived her arm and hand conditions as substantially limiting her only in the life activity of working.[26]  Plaintiff alleges that she "was forced to take several leaves of absence after she sought assistance in unloading a file cabinet in preparation for new carpet being laid in the department, a task that was not within her job description."  (Doc. # 18, at 16; Doc. # 25, at 19).  She further complains that "[i]n placing [her] on leave defendant provided [her] with a copy of her job description and asked [her] for a statement describing the condition that rendered her unable to perform the essential functions of her job."  (Doc. # 18, at 16; Doc. # 25, at 19).

"Generally a doctor's refusal to release a person to return to work is a legitimate reason for an employer to prevent that person from returning to work."  *Calvo v. Walgreens Corp.,* No. 08-16229, 2009 WL 2435700, at *5 (11th Cir. 2009); *see also* 42 U.S.C. § 12112(d)(4) (an employer may ask for medical documentation that is "shown to be job-related and consistent with business necessity" and "may make inquiries into the ability of an employee to perform job-related

_____

[26] Plaintiff does not contend that Defendant perceived her as substantially limited in the life activity of performing manual tasks, and for good reason. There is no evidence that Defendant "perceived her limitations in performing manual tasks as having a permanent or long-term impact and as preventing or severely restricting her from performing activities of central importance to most persons' lives." *Carruthers*, 357 F.3d at 1217.

functions"); *Kincaid v. City of Omaha*, 378 F.3d 799, 804-05 (8th Cir. 2004) (approving city's requirement that a doctor provide a release prior to an injured person's returning to work). Indeed, this Circuit has cited with approval an employer's requirement that employees suffering from an impairment complete a medical program before being allowed to perform certain job duties. *Collado v. United Parcel Serv.*, Co., 419 F.3d 1143, 1159 (11th Cir. 2005) (analyzing UPS's requirement that its diabetic drivers complete a medical program before being allowed to drive trucks). "The goal of the release requirement - to ensure that returning to work does not hamper recovery - is rational and legitimate." *Revels v. Lucent Tech., Inc.*, 60 Fed. Appx. 740, 745-46 (10th Cir. 2003).

Although this case is slightly unique in that Plaintiff was already working when she was involuntarily placed on leave in order to obtain a doctor's release, the principle is the same. Plaintiff informed the City that she could not unload her file cabinet, a job duty assigned to her by one of her supervisors. Plaintiff reported that her inability to perform that task was due to an injury, the extent of which was unknown to the City. (Plaintiff Dep. DX5 (Doc. # 16-4, at 13) ("I am NOT able to empty the file cabinet due to the severity of the pain in my wrist, hand and forearm."). Even assuming that the City knew or should have known that the injury of which Plaintiff complained was the same known injury for which she was being treated by City doctors (as Plaintiff contends), no City doctor had limited Plaintiff in lifting, grasping, or unloading files from a file cabinet. To the contrary, Defendant had before it numerous Certificates from the City's doctors releasing Plaintiff to full duty work with only an indication that Plaintiff required regular typing breaks.[27]

---

[27] Again, Defendant mischaracterizes the evidence by failing to accurately state what the City doctors opined on the Certificates. Defendant repeatedly suggests that both the April 2006 and October 2006 Certificates "released [Plaintiff] from the City's medical services unit care with no accommodations or restrictions for her wrist ailment and able to work." (Doc. # 24, at 13; *see also* Doc. # 16, at 16 ("On or about April 11th, 2006 (and Oct. 24th, 2006), Thomas was released from

The undisputed facts illustrate that in placing Plaintiff on leave, Defendant did not "regard" Plaintiff as having an impairment that substantially limited her ability to work; Defendant simply sought - as is permissible under the Act - to *find out* if Plaintiff had such an impairment.  Plaintiff herself informed Defendant that she could not unload the file cabinet – a task that directly, if not indirectly, implicates her ability to handle files.  It is uncontroverted that "filing maintenance, and indexing of revenue bond issue projects, transcripts, meeting minutes and other documents" was one of Plaintiff's essential job functions.  (Plaintiff Dep. p. 23-24; Smith Dep. DX5).  It does not make sense for Plaintiff to now question why "[i]n placing [her] on leave defendant provided [her] with a copy of her job description and asked [her] for a statement describing the condition that rendered her unable to perform the essential functions of her job."  (Doc. # 18, at 16; Doc. # 25, at 19).  An employer does not "regard" a plaintiff as disabled simply because it requires an employee who complains of injury to obtain a doctor's opinion as to what job duties the employee can or cannot do in light of that injury.

Nevertheless, even if the court assumes that sufficient evidence establishes that Plaintiff was perceived as being substantially limited *in her lifting ability*, that is not enough to satisfy the "regarded as" definition of disability.  This Circuit has held that being regarded as substantially limited "only with respect to fairly narrow tasks within a particular job . . . clearly fail[s] to satisfy the 'broad range of jobs' test." *Rossbach*, 371 F.3d at 1361; *see Cash v. Smith*, 231 F.3d 1301, 1306-

---

the City's medical services unit care with no accommodations or restrictions for her wrist ailment and able to work."); Doc. # 26, at 3 ("Plaintiff was released from City's Medical care without accommodations – April 11th, 2006 and again October 24th, 2006.")).  To the contrary, the April 11, 2006 and October 24, 2006 Certificates are materially distinct: while the former released Plaintiff to full duty with no additional comment, the latter (as had the three Certificates before it) requested that Plaintiff be allotted ten-minute rest breaks for each hour of typing.  (Smith Dep. PX21, PX22, PX23, PX8).

07 (11th Cir. 2000) (finding that employee failed to show that employer regarded her as substantially limited in major life activity of working, based on evidence that employer prohibited her from driving a company vehicle once it became aware of extent of her medical problems); *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 857-58 (11th Cir. 1998) (finding that employer's vague assertion that plaintiff was unable to perform any job that precludes her from having regular access to a restroom did not satisfy "broad range of jobs" requirement); *Gordon v. E.L. Hamm & Assoc.*, 100 F.3d 907, 913 (11th Cir. 1996)(holding that employer must view the impairment "as generally foreclosing the type of employment involved, not just a narrow range of tasks").

Moreover, even if the court assumes that the City harbored the belief that Plaintiff was not only substantially limited in her lifting ability, but also foreclosed from performing her job *in general*, that is not enough to satisfy the "regarded as" definition of disability.  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working" and thus an impairment must "be perceived to preclude ... an individual from more than one type of job, even if the job foreclosed is the individual's job of choice." *Carruthers*, 357 F.3d at 1216.  Here, there is no evidence that the City thought Plaintiff's impairments substantially limited her in performing a *class of jobs or a broad range of jobs*.

> To the contrary, . . . after [Plaintiff's] diagnosis and prior to [her statement that she could not unload her file cabinet, Plaintiff] continued to perform [her] duties with no performance change. . . .  Further, [Defendant] believed that [Plaintiff] could continue to work as evidenced by their offers to let [her] return to work if [s]he could obtain a release from his doctor.

*Butler v. Greif Bros. Service Corp.*, 231 Fed.Appx. 854, 857-58 (11th Cir. 2007).

For all of these reasons, Plaintiff has failed to demonstrate that she falls within any of the three methods of defining disability under the ADA.   Because the court finds that Plaintiff has not

demonstrated that she is disabled in satisfaction of the first element of her *prima facie*, the remaining disputed element of her *prima facie* case is not addressed.[28]  Plaintiff's failure to meet her initial burden warrants summary judgment on her ADA discrimination claims.

## V.    Analysis of the ADA Retaliation Claim

In addition to prohibiting discrimination, the ADA also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). "This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Accordingly, courts assess ADA retaliation claims under the same framework employed for retaliation claims arising under Title VII.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998).

To establish a *prima facie* case of ADA retaliation, a plaintiff must show: "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action." *Standard*, 161 F.3d at 1328. As with a discrimination claim, "[o]nce a plaintiff has established a *prima facie* case [of retaliation], the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If this is accomplished, the plaintiff then bears the ultimate burden of proving by a

---

[28] As mentioned earlier, Plaintiff's failure to establish that she is "disabled" within the meaning of the ADA also forecloses her discrimination claim that Defendant failed to provide her with a reasonable accommodation when it did not provide her assistance in emptying the file cabinet.

preponderance of the evidence the reason provided by the employer is a pretext for prohibited, retaliatory conduct. *Pennington*, 261 F.3d at 1266.

As an initial matter, the court observes that all allegations of failure to accommodate Plaintiff upon her request are properly analyzed under the discrimination framework, not as a retaliation claim. *See Happy Herman's*, 117 F.3d at 1288 (11th Cir. 1997)(refusing to address the plaintiff's "retaliation" claims that were based on simple refusals to accommodate her because those acts "relate directly to her 'reasonable accommodation' discrimination claim, not her retaliation claim"); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001)(rejecting a retaliation claim based on a failure to reasonably accommodate because it "merely reclothes Lucas' ADA discrimination claim"). Accordingly, to the extent that Plaintiff's accommodation arguments intermingle with her retaliation claim, they are not cognizable.

Plaintiff bases her retaliation claim on Defendant's "actions in refusing to return [her] to work." (Doc. # 18, at 18). Specifically, Plaintiff complains that Defendant repeatedly "forced" her to take unpaid leave and eventually instituted disciplinary procedures against her that resulted in the termination of her employment. (Doc. # 18 at 18-19, Doc. # 25, at 24-26; Doc. # 27, at 4). Plaintiff has alleged,[29] and Defendant has not challenged, that she has established a *prima facie* case of

---

[29] Plaintiff avers:

> There is absolutely no dispute that plaintiff engaged in protected activity when she sought assistance with the file cabinet and when she sought ten minute rest breaks. There is also no dispute defendant placed plaintiff on leave and refused to return her to work as a consequence of her seeking those accommodations.

(Doc. # 18, at 19). Plaintiff further contends:

> As stated before, plaintiff is a long term employee with no history of performance, attendance or disciplinary problems. There is also no dispute that both Frazier and

retaliation.  (*See* Doc. # 16, at 17-19; Doc. # 24, at 16-17; Doc. # 26, at 10-11)(offering only an articulated reason for the alleged retaliatory conduct)).

Because the *prima facie* case is not in dispute, the court turns to the question of whether Plaintiff has shown that the City's articulated reasons for this conduct are pretextual or, at the least, that discrimination was a "motivating factor" in the City's conduct.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.   In defense of its conduct, the City contends that all of Plaintiff's leave requests were voluntary and that she could have "present[ed] herself for work" but "decided" to request leave instead.  (Doc. # 24, at 13).  With respect to the institution of disciplinary proceedings against Plaintiff, the City explains:

> On or about June 21st, 2007, the City contacted Thomas by letter about her continuing employment and future with the City like it had done on previous occasions. In order to remain in a leave without pay status, Thomas was required to submit the paperwork to the City and the Jefferson County Personnel Board. The Plaintiff failed fill out the appropriate paperwork when requested by the City to

---

(Footnote 29 cont'd)

> Smith knew well of plaintiff's ongoing problems with her hands. There was simply no need for plaintiff to secure further documentation of her condition. Plaintiff engaged in protected activity when she sought assistance with the file cabinet and when she sought ten minute rest breaks. Within one day of seeking that assistance defendant issued a memorandum directly mentioning her request for an accommodation that stated plaintiff would not be allowed to work unless she had no restrictions or limitations.

(Doc. # 25, at 24-25).  Finally, Plaintiff argues:

> [T]here is no dispute that [Defendant] would not have sent her home on leave if she had not asked for an accommodation. Defendant's actions in subjecting plaintiff to forced leave were retaliatory. She was sent home from work just one day after she sought an accommodation.

(Doc. # 27, at 4).

continue to receive leave without pay . . . . On August 27th, 2007, the Plaintiff was terminated by the City primarily for being AWOL.

(Doc. # 24, at 16-17).   In response, Plaintiff contends:

> After being sent home, plaintiff provided defendant with medical documentation of her injuries from three doctors, but was not allowed to return to her job. Plaintiff further repeatedly . . . stated that she had not requested leave and proclaimed that she did not desire to be on leave.  Defendant never told plaintiff she could return and repeatedly ignored the portions of plaintiff's letters that indicated that she did not desire to be on leave.  Plaintiff could not just show up at work, she had to be given permission to do so.  Defendant refused such permission and ignored plaintiff's documentation and repeated assertions that she did not want to be off work. Defendant's only response to plaintiff's repeated declarations were letters advising plaintiff of the expiration of her leave.   None of defendant's correspondence mentioned that it did not believe plaintiff was ineligible for an accommodation or even told plaintiff she was free to return.  The only rational conclusion plaintiff could draw from defendant's silence on the issue was that defendant's policy precluded any accommodations for disabilities and as such, she was not eligible to return to her position. Defendant made absolutely no effort to correct plaintiff's belief that she was being forced to remain on leave against her will. Defendant never addressed those statements and did not make any effort to correct any alleged misapprehension because there was no misunderstanding.

(Doc. # 25, at 25-26).

After a careful review of the summary judgment record, the court has determined that a reasonable jury could (but is not required to) conclude that Defendant's articulated reasons were a pretext for ADA retaliation and/or that retaliation was a "motivating factor" for the conduct at issue. Viewing the evidence in a light most favorable to Plaintiff, the Rule 56 evidence establishes the following.  After Plaintiff's November 2006 letter advising Defendant that she understood she "would not be allowed to work until [she] was cleared to work without limitations," Defendant allowed over *four months* of requests for leave - much of it unpaid - to transpire before correcting that interpretation.  During that time period, the parties continued to exchange information regarding Plaintiff's leave requests, and  Plaintiff continued to inform Defendant that the only reason she

sought leave was because Defendant had told her she had to be "limitation-free" to return to work and she felt she had no other choice.

Nevertheless, Frazier felt "no need to clarify that she could come back if she had clearance from . . . . her personal physician." (Frazier Dep. pp. 132-33). Frazier admits that even after he realized Plaintiff's allegation that he had refused to let her come back to work was not a "correct characterization," he still felt no need to tell her "this might be just a mixup, all you've got to do is bring in some papers that tell me what your limitations are." (Frazier Dep. pp. 150-51).

The evidence also indicates that in March 2007, when Defendant finally informed Plaintiff that it still expected her to submit a personal physician's statement of her abilities and limitations, it did not tell Plaintiff she could return to work when she provided the information. Instead, Defendant informed Plaintiff that such a statement from her personal physician now was required for "approv[al of her leave] request." (DX15).

The evidence further reveals that in April 2007, when Plaintiff submitted "information from [her] physician outlining [] restrictions and limitations as they relate to [her] job duties" along with a leave request included only because the physician had not cleared her "to work without limitations," Defendant again failed to correct Plaintiff's interpretation, opting instead to simply approve her leave request. Finally, the record shows that in response to Plaintiff's July 2007 letter expressing frustration that her efforts to "work my 30 years and then retire" were thwarted because "you have refused to clear me to return to work unless I have no limitations," Defendant instituted termination proceedings.

In light of this evidence, the court cannot agree with Defendant that:

> the evidence clearly shows that the City was attempting to have her return back to work and that she declined. The City and its employees never forced the Plaintiff to take unpaid leave of absence, she voluntarily signed each and ever request for leave without pay as opposed to just presenting herself for work. The Plaintiff was the one that decided that she did not want to come back to work.

(Doc. # 24, at 13).  Accordingly, summary judgment on Plaintiff's retaliation claim is due to be denied.[30]

## VI.   Conclusion

Viewing the evidence in a light most favorable to Plaintiff, the court finds that Defendant's motion for summary judgment is due to be granted in part and denied in part.  There are issues of material fact to be presented to a jury on Plaintiff's ADA claim for retaliation.  However, with respect to Plaintiff's ADA claim for discrimination, there exists no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.   Plaintiff's motion for summary judgment is due to be denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** this _____17th_____ day of September, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[30] In so deciding, the court has reviewed the evidence as presented in the summary judgment record, viewing it in the light most favorable to Plaintiff.  Although it may well be that Defendant prevails before a reasonable, fact-finding jury after all of the evidence is presented, that is not for the court to determine at this time.

44